IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

KIMBERLY P. MCQUADE,          )
                             )
          Plaintiff,          )
                             )
v.                            )          CIVIL ACTION NO. 1:09-01269
                             )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security, )
                             )
          Defendant.          )

M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 40 - 433, 1381-

1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on

the Pleadings (Document Nos. 15 and 17.) and Plaintiff's Reply. (Document No. 18.) Both parties

have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 4

and 5.).

The Plaintiff, Kimberly P. McQuade (hereinafter referred to as "Claimant"), filed

applications for DIB and SSI on June 26, 2006 (protective filing date), alleging disability as of

March 31, 2006, due to chronic depression, hearing problems, a learning disability, anxiety, stomach

problems, and anemia.[1] (Tr. at 21, 107, 112, 181-83, 184-87, 200, 204.) The claims were denied

initially and upon reconsideration. (Tr. at 107-09, 112-14, 118-20, 121-23, .) On, Claimant requested

---

[1] In her request for reconsideration, Claimant alleged a lump in her left breast and cataracts
as additional disabling impairments. (Tr. at 120-21, 247.)

a hearing before an Administrative Law Judge (ALJ). (Tr. at 127.) Hearings were held on March 12,

2008, and November 13, 2008, before the Honorable Steven A. De Monbreum. (Tr. at 32-77, 78-

102.) By decision dated February 4, 2009, the ALJ determined that Claimant was not entitled to

benefits. (Tr. at 21-31.) The ALJ's decision became the final decision of the Commissioner on

October 28, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On

May 7, 2009, Claimant brought the present action seeking judicial review of the administrative

decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.

See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

impairment which can be expected to last for a continuous period of not less than 12 months . . . ."

42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of

disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2009). If an individual is found "not disabled"

at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under

the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§

404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from

a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to

Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the

claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the

claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e),

416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2009). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of

Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, March 31, 2006. (Tr. at 24, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant did not suffer from any severe impairments. (Tr. at 24, Finding No. 3.) The ALJ however, found that Claimant's "adjustment disorder learning disorder, and/or borderline intellectual functioning, singly or in combination, are 'severe' in that they limit the [C]laimant to simple, unskilled work." (Tr. at 24.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 24, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity "to perform the full range of work at all exertional levels apart from that which is not unskilled in nature. (Tr. at 27, Finding No. 5.) At step four, the ALJ found that Claimant could return to her past relevant work as a cashier. (Tr. at 30, Finding No. 6.)

Additionally, the ALJ found that Claimant was not disabled under the framework of Medical-Vocational Guideline 204.00, because the entire unskilled job base was left intact. (Tr. at 30-31, Finding No. 10.) On this basis, benefits were denied. (Tr. at 31, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on January 9, 1968, and was 40 years old at the time of the administrative hearing, November 13, 2008. (Tr. at 30, 35, 181.) Claimant had a high school education and was able to communicate in English. (Tr. at 30, 35-36, 203, 210.) In the past, she worked as a cashier, cook, and food service worker, as well as a life coach. (Tr. at 30, 37-46, 205, 215-22.)

6

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will summarize it herein as it relates to Claimant's claims regarding her mental impairments.

**St. Luke's Hospital**:

On December 7, 2005, Claimant reported to St. Luke's Hospital with complaints of depression, with an eight year history which worsened the last two weeks. (Tr. at 440-50.) Claimant was tearful with poor eye contact. (Tr. at 440, 442.) She reported that she was not sleeping well and denied suicidal ideation. (Tr. at 440.) Claimant was taking Zoloft 100mg. (Id.) Claimant was discharged with instructions to report to Southern Highlands Mental Health Center for a crisis evaluation. (Tr. at 446.) Claimant testified at the March 12, 2008, administrative hearing that a bed was unavailable at Southern Highlands, and therefore, she was not admitted. (Tr. at 91.)

**Elizabeth Jennings, M.A.**:

On January 25, 2006, Claimant was referred to Elizabeth Jennings, M.A., a licensed psychologist, by her primary care physician at Athens Medical Center, Physician's Assistant Ruth Rose, for treatment regarding her complaints of depression. (Tr. at 422-23.) Claimant reported that she had experienced depression her entire life, which had worsened since she began having marital problems. (Tr. at 422.) Claimant's husband left her the week before Christmas. (Id.) Claimant was then being prescribed Lexapro 10 mg two a day and Xanax as needed. (Id.) Claimant advised that she worked at the Salvation Army Thrift Store, which she described as a "good job," with caring supervisors. (Id.) She previously worked as an Associate Counselor in the day program, working with mentally challenged adults at Southern Highlands Community Mental Health Center. (Tr. at 423.) Claimant also reported a decreased appetite and difficulty sleeping. (Tr. at 422.) Most of

Claimant's free time was spent caring for her children. (Tr. at 423.) Claimant indicated that she was a high school graduate. (Id.) Based on Claimant's reports of feeling depressed and having poor memory, concentration, and self-concept, Ms. Jennings diagnosed major depressive disorder, single, moderate and assessed a GAF score of 60. (Id.) Ms. Jennings recommended that Claimant participate in individual and family therapy to focus on her depression, and advised that she continue to obtain medication from P.A. Ruth Rose. (Id.)

On February 15, 2006, Claimant presented for individual therapy and complained of problems with her marriage. (Tr. at 421.) Claimant reported mild suicidal ideation, but stated that she did not feel that she would kill herself. (Id.) Ms. Jennings encouraged Claimant to return her family practitioner for medication and monitoring. (Id.)

Claimant returned with her husband on March 6, 2006, for marriage counseling. (Tr. at 420.) Claimant expressed concern that her husband would leave her with all the responsibility of child care if they divorced. (Id.) On March 13, 2006, Claimant reported that she and her husband had separated and he moved into his mother's house. (Tr. at 419.) Ms. Jennings noted that Claimant was doing a little bit better and was relying heavily on church support. (Id.) She reported no suicidal ideation. (Id.) On March 27, 2006, Claimant reported that she and her husband were attempting to reconcile. (Tr. at 418.) Claimant reported continued poor sleep with frequent, intermittent waking. (Id.)

On April 10, 2006, Claimant reported continued difficulty communicating with her husband. (Tr. at 417.) She feared approaching her husband to address a lot of issues out of fear that he would leave again. (Id.) Ms. Jennings stressed the importance in being herself and in communicating with her husband. (Id.) On April 24, 2006, Claimant reported that she quit her job because she could no

longer be around others. (Tr. at 416.) Claimant also reported that her depression was somewhat better and Ms. Jennings noted that Claimant looked better and had an improved affect. (Id.) Claimant indicated that she remained hesitant to discuss some of the marital issues with her husband. (Id.) Claimant reported on May 9, 2006, that her quitting her job caused a financial strain on her family but stated that she felt unable to cope in her work environment. (Tr. at 415.)

On May 22, 2006, Ms. Jennings submitted a letter to the West Virginia Department of Health and Human Resources on behalf of Claimant. (Tr. at 414.) Ms. Jennings reported that Claimant had significant depressive and anxiety symptoms for which she was receiving medication from her family doctor and individual and physical therapy from her. (Id.) Ms. Jennings opined that Claimant had to quit her job due to her mental issues and was "unable to hold gainful employment at this time." (Id.) On July 6, 2006, Claimant returned to Ms. Jennings for individual therapy, focusing on her husband. (Tr. at 413.) She reported continued difficulty dealing with her husband's depression. (Id.) Ms. Jennings believed that a lot of Claimant's depression and anxiety were situated around her marriage and would improve if the marriage improved. (Id.) On August 3, 2006, Ms. Jennings noted that Claimant was talkative with a euthymic mood and slightly labile affect. (Tr. at 412.) Her speech, memory/cognition, and thought processes were within normal limits and she denied suicidal and homicidal ideation. (Id.)

Claimant continued to report that she was depressed and had difficulty sleeping on August 31, 2006, and October 5, 2006. (Tr. at 410-11.) However, Claimant reported that she was doing better with her mood during the day. (Tr. at 411.) Ms. Jennings noted a euthymic mood and broad affect and a fair insight. All other areas on mental status exam were within normal limits. (Tr. at 410-11.) Ms. Jennings noted a good response to treatment on October 5. (Tr. at 410.)

Claimant returned to Ms. Jennings on January 15, 2007, and reported problems with sleep disturbance. (Tr. at 409.) She expressed concerns with her husband's complaints of significant back pain but reported that her marital relationship was improving with continued communication difficulties. (Id.) On February 22, 2007, Claimant reported that she continued to do fairly well with her husband and there was no more talk of separation. (Tr. at 408.) Ms. Jennings noted Claimant continued to take Lexapro. (Id.) Claimant continued to report for individual therapy sessions from March 22, through December 18, 2007. (Tr. at 524-31.)

On August 28, 2007, Ms. Jennings conducted a psychological evaluation at the request of Claimant's attorney. (Tr. at 451-55.) Claimant reported significant sleep problems, crying spells two or three times a week, a poor appetite, low energy levels, an extremely hateful mood, periodic suicidal thoughts, feelings of intimidation by her children's teachers, and visual hallucinations. (Tr. at 451.) On mental status exam, Ms. Jennings noted that Claimant's psychomotor behavior was mildly slowed, that she transported herself to the evaluation, and that she maintained good eye contact. (Tr. at 453.) Claimant's speech was coherent and easily understood, she was oriented to all spheres, and her thought content was within normal limits, as were her perceptual abilities. (Id.) She followed directions well and was cooperative. (Id.)

Ms. Jennings noted that she administered IQ testing on July 28, 2006, which placed Claimant in the "mild range of mental retardation to the borderline range." (Tr. at 452.) She noted that significant deficits in learning were indicated. (Id.) Ms. Jennings administered the Pain Patient Profile (P3) and the Beck Anxiety Inventory. (Tr. at 453-54.) Her Beck Anxiety Inventory Score placed her in the severe range of symptoms. (Tr. at 454.) She also administered the Woodcock Johnston III Tests of Achievement, which indicated a total achievement of ten years and six months.

(Id.) Ms. Jennings opined that these scores indicated that Claimant "would have significant difficulty completing detailed or complex tasks." (Id.)

Claimant continued to treat with Ms. Jennings through at least December 18, 2007. (Tr. at 477-89, 524-33.) She reported continued problems with depression and anxiety and situational stressors involving her family and finances. (Id.)

Ms. Jennings diagnosed major depressive disorder, recurrent, moderate; pain disorder associated with both psychological factors and a general medical condition; anxiety disorder NOS; borderline intellectual functioning; and assessed a GAF of 55. (Tr. at 454-55.) Ms. Jennings opined that Claimant met the "criteria for mild mental retarding; however, her overall functioning is felt to be within the lower borderline range based on adaptive functioning." (Tr. at 455.) She further opined that Claimant's ability to interact with and relate to others was moderately to markedly impaired and that she would have extreme difficulty completing complex or involved tasks. (Id.) Ms. Jennings opined that Claimant "would not be capable of sustaining gainful employment in a reliable and competitive manner in any time in the near future." (Id.)

On January 31, 2008, Ms. Jennings completed a form Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 534-36.) Ms. Jennings assessed marked to extreme limitations in all mental work-related activities. (Tr. at 534-35.) In support of her assessment, Ms. Jennings noted that Claimant suffered from major depression, generalized anxiety disorder, borderline intellectual functioning, and deficits in memory and concentration.(Tr. at 535.) She further noted that Claimant reported feeling intimidated by others and would withdraw socially. (Id.) Ms. Jennings also reported that Claimant had significant difficulty with focus, persistence, and concentration, and that due to literacy issues, she would have extreme difficulty following detailed

or complex instructions. (Tr. at 536.) Ms. Jennings opined that Claimant's mental impairments would cause her to miss more than three days of work per month. (Id.)

**Consultative Psychological Evaluation - Kelly Robinson, M.A.:**

On August 21, 2006, Kelly Robinson, M.A., performed a consultative psychological evaluation. (Tr. at 344-50.) Ms. Robinson noted that Claimant drove herself to the interview unaccompanied. (Tr. at 344.) Claimant reported depression, anxiety, learning problems, and medical problems. (Id.) Claimant further reported a depressed mood, an increase in weight and appetite, sleep difficulty, feelings of hopelessness and worthlessness, crying spells, and a diminished interest in activities. (Id.) Regarding depression, Claimant reported a 20 year history of similar problems. (Tr. at 345.) Regarding anxiety, Claimant reported a four month history of similar problems. (Id.) With respect to learning problems, Claimant reported that she could read and write her name and simple words. (Id.) However, she indicated difficulty reading her mail and reading instructions, and required her husband to read her mail to her and her mother completed her job applications. (Id.) Claimant reported that she graduated from high school, but was placed in special education classes beginning in the eighth grade. (Id.) She reported that received below average grades and had to repeat one unknown grade level. (Tr. at 346.)

On mental status examination, Ms. Robinson noted that Claimant was alert and oriented throughout the evaluation. (Tr. at 346.) Her mood was dysphoric, her affect was restricted mildly, her thought processes were logical and coherent, and there was no indication of delusions, obsessive thoughts, or compulsive behaviors. (Tr. at 347.) Ms. Robinson reported that Claimant's insight was fair, her judgment was within normal limits, her immediate and remote memory was within normal limits, but her recent memory was moderately deficient. (Id.) Claimant's concentration was within

12

normal limits, as was her psychomotor behavior. (Id.) Claimant reported a history of three suicide attempts, in which she cut her wrists and overdosed on medication. (Id.) Her last attempt was two months prior to the evaluation, though she denied suicidal or homicidal ideation during the evaluation. (Id.)

A psychometrician administered the WAIS-III, and Claimant achieved a verbal IQ of 70, a performance IQ of 69, and a full scale IQ of 67. (Tr. at 347.) Claimant also was administered the WRAT-III, on which she scored the equivalent of a third grade reading and spelling level and sixth grade arithmetic level. (Tr. at 348.) Ms. Robinson considered the results of these tests to be invalid due to Claimant's lack of motivation and interest, as well as her slow pace. (Id.)

Ms. Robinson diagnosed major depressive disorder, recurrent, moderate, and an anxiety disorder, NOS. (Tr. at 348.) Claimant reported her activities to include taking medications, talking with her children, watching television, talking with her mother on the telephone, visiting with her moths, cooking simple meals, doing laundry, going to church, making the beds, emptying the trash, going to Walmart with her children for an hour, and taking her children to the doctor. (Tr. at 349.) Ms. Robinson assessed Claimant's social functioning and concentration as being within normal limits, and her persistence and pace as being moderately deficient based on her performance on the WAIS-III. (Id.) Ms. Robinson further assessed that Claimant was capable of managing any benefits that she might receive. (Tr. at 350.)

**State Agency Psychologists**:

Dr. Rosemary L. Smith, Psy.D., a state agency psychologist, completed a form Psychiatric Review Technique on August 28, 2006. (Tr. at 351-64.) Dr. Smith reviewed Claimant's medical records and determined that Claimant's affective and anxiety-related disorders were not severe

impairments. (Tr. at 351, 354, 356.) She assessed only mild limitations in activities of daily living and maintaining social functioning, concentration, persistence, or pace. (Tr. at 361.) Dr. Smith noted that there were no episodes of decompensation of extended duration. (Id.)

On November 22, 2006, Dr. Timothy Saar, Ph.D., a state agency psychologist, completed a form Psychiatric Review Technique. (Tr. at 386-99.) Dr. Saar concluded that Claimant's depression and anxiety were non-severe impairments, resulting in only mild limitations in activities of daily living and maintaining social functioning, concentration, persistence, or pace. (Tr. at 386, 389, 391, 396.) He further found that Claimant had experienced no episodes of decompensation of extended duration. (Tr. at 396.)

**L. Andrew Steward, Ph.D.**:

On November 18, 2008, Dr. L. Andrew Steward, Ph.D., conducted a psychological evaluation at the request of Claimant's attorney. (Tr. at 539-45.) On mental status exam, Dr. Steward noted that Claimant was appropriately talkative and rapport was established. (Tr. at 539.) Claimant's affect was constricted, her mood was anxious and dysphoric, and she was oriented in all spheres. (Tr. at 540.) Dr. Steward noted that all of Claimant's mental and memory functions, including fund of information, judgment, abstract reasoning, ability to perform calculations, attention and concentration, and immediate, recent, and remote memory, were depressed. (Id.)

Regarding Claimant's education, Dr. Steward noted that she was in special education for most everything except math. (Tr. at 540.) Claimant reported that she was nervous a lot and depressed all the time. (Id.) These problems began in 1993, shortly after her daughter was born. (Id.) Children, crowds, and noise bother Claimant. (Id.) Claimant reported past suicidal thoughts and three years ago, she slept with a loaded gun and slit her wrists. (Tr. at 541.) She reported difficulty

14

sleeping, an increased appetite, that she cried all the time, and feelings of worthlessness, uselessness, helplessness, and hopelessness. (Id.) Claimant reported a lack of self esteem and hallucinations. (Id.)

Dr. Steward administered the WAIS-III, and Claimant achieved a verbal IQ of 67, a performance IQ of 77, and a full scale IQ of 69. (Tr. at 543.) He opined that Claimant's full scale IQ placed her within the mild mental retardation range. (Tr. at 544.) Dr. Steward noted that Claimant exerted a very strained effort on testing and that her IQ scores were believed to be valid and reliable. (Tr. at 539, 545.) Dr. Steward also administered the WRAT-4, on which Claimant achieved the grade equivalents of 3.9 in reading, 7.3 in math, and 3.7 in spelling. (Tr. at 543.)

Dr. Steward diagnosed major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; mild mental retardation; and assessed a GAF of 45. (Tr. at 544.) He opined that Claimant appeared "permanently and totally disabled from any type of substantial gainful occupation currently available in the United States economic market on a sustained basis for at least a year or more." (Id.) He further opined that her prognosis was poor, but that she was capable of managing her own funds. (Id.)

On November 18, 2008, Dr. Steward also completed a form Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 546-48.) He opined that Claimant had moderate to marked limitations in all mental work-related activities. (Id.) He further opined that Claimant had suffered from mild mental retardation all her life and that her mental impairments would cause her to miss more than three days of work per month. (Tr. at 548.)

**Medical Expert Dr. Charles Holland, Ph.D.**:

At the administrative hearing, Dr. Charles Holland, Ph.D., a clinical psychologist, testified as an independent medical expert regarding Claimant's mental impairments. (Tr. at 60-73.) Dr.

Holland testified that he had reviewed all of the medical records in Claimant's file and was familiar with the Social Security rulings, statutes, and regulations pertaining to the listing of medical impairments. (Tr. at 60.) Dr. Holland opined that Claimant did not meet or equal the criteria of any listing level mental impairment. (Tr. at 60-65.) He testified that Claimant's cognitive limitations were inconsistent with the medical and educational evidence of record and suggested that she exaggerated her limitations, particularly regarding her learning disability. (Tr. at 62-63.) Dr. Holland noted that the only evidence of Claimant's special education classes consisted of her own self-report. (Tr. at 62-63.) He noted that Claimant achieved a 79.8 grade point average in high school. (Tr. at 63.) Dr. Holland questioned some of the tests administered by Ms. Jennings and noted that she essentially found only her sleep patterns and energy levels to have been impaired. (Tr. at 64.) He questioned a mild mental retardation diagnosis. (Id.) Dr. Holland also opined that the evidence relating to Claimant's emotional problems was contradictory and did not support a diagnosis of major depression. (Tr. at 63-67.) At most, Dr. Holland opined that the evidence may have supported a diagnosis of an adjustment disorder. (Tr. at 65.) He opined that she was capable of performing simple, easy, unskilled work. (Tr. at 67.)

In response to Dr. Steward's testimony, Ms. Jennings submitted a letter to Claimant's attorney, dated December 2, 2008. (Tr. at 520.) Ms. Jennings stated that she administered the P3 and Beck Inventory tests to assist with the identification of presenting symptoms and for development of a continued treatment plan. (Id.) She noted that Claimant required assistance with reading items on these tests. (Id.) Ms. Jennings further reported that Claimant's full scale IQ of 67 suggested functioning in the mild range of mental retardation. (Id.) Ms. Jennings opined that this "finding would be consistent with the presentation of borderline intellectual functioning as presented in the

16

Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition - Text Revision (DSM-IV-TR) and discussed by the undersigned in terms of adaptive functioning." (Id.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that Claimant's mental impairment meets Listing 12.05C and 12.05D . (Document No. 16 at 12-18.) Claimant notes that with the exception of her performance IQ scores, all other IQ scales from three different examiners virtually were indistinguishable, which meeting Listing level requirements. (Id. at 13.) Claimant further asserts that she has adaptive deficits in communication skills, social and interpersonal skills, functional academic skills, and work. (Id. at 14.)  In response, the Commissioner asserts that it was not necessary for the ALJ to discuss Claimant's IQ scores at length because even assuming she met listing level IQ scores, she failed to prove that she had significant deficits in adaptive functioning, prior to the age of 22. (Document No. 17 at 12-16.)

<u>Analysis</u>.

"The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," regardless of age, education or work experience, see <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a) (2009). Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to  significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment  before age 22." 20 C.F.R. Pt. 404, Subpt. P, App.

17

1, § 12.05 (2009). The required level of severity for Listing 12.05 is satisfied when any one of the four following requirements is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

> B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

To meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2009). The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. United States Dep't of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam). A "severe" impairment is one "which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2009). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of section 12.05C. Further, the Secretary has defined a severe impairment or combination of

impairments as those which significantly limit an individual's physical or mental ability to do basic work activities. The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes the second prong of section 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also The Merck Manual of Diagnosis and Therapy 2491(Mark H. Beers, M.D. & Robert S. Porter, M.D., eds., 18th ed. 2006) (defining mental retardation as "significantly subaverage intellectual functioning (often expressed as an intelligent quotient < 70 to 75) combined with limitations of > 2 of the following: communication, self-direction, social skills, self-care, use of community resources, and maintenance of personal safety. Management consists of education, family counseling, and social support).[3] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, (DSM-IV)(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well she meets the standards of personal independence expected of someone in her particular age group, sociocultural background, and community setting. Id. at 40. Despite Claimant's argument to the contrary, the Regulations make clear that Listings 12.05C is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

The structure of the listing for mental retardation (12.05) is different from that of the

---

[3] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning.  Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51; severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." *The Merck Manual of Diagnosis and Therapy* 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

19

other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

Though the ALJ found that Claimant had no severe mental impairment, he assumed for purposes of his decision, that Claimant's adjustment disorder, learning disorder, and/or borderline intellectual functioning, singly or in combination, were severe, in that they limited her to simple, unskilled work. (Tr. at 24.) He assessed Claimant as having mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild to moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 25.) Regarding Listing 12.05, the ALJ, found that assuming that Claimant had lifelong IQ scores of 70 or less, she failed to demonstrate significant deficits in adaptive functioning prior to the age of 22. (Tr. at 27.) The ALJ noted that Claimant raised three children, worked in the past, and was issued a regular certificate of high school credits, although she claimed to have been in special education. (Id.)

The evidence reveals that Claimant was a high school graduate and achieved nearly a "B" average in her high school classes. (Tr. at 27-28, 291.) Her high school records demonstrate that she received a "regular" diploma.. (Id.) The high school did not retain special education records beyond a five year period of time, and therefore, there was no documentation regarding her placement in a special education program. (Id.) Claimant however, consistently reported that she was enrolled in such classes, with the exception of math. The ALJ also noted that Claimant maintained employment

in the past as a daycare worker, custodian, cook, cashier, and food service worker. (Tr. at 30.) Her testimony revealed that she worked as a life coach for physically and mentally challenged adult, assisting them with learning basic life and vocational skills. (Tr. at 41-44.) The ALJ noted that it strained credibility to suggest that Claimant was mentally retarded but yet was allowed to teach life skills to other mentally retarded individuals. (Tr. at 51-52.) Claimant explained that her brother, who also worked there, was instrumental in her obtaining employment at Southern Highlands. (Tr. at 52.) Nevertheless, the ALJ found such inconsistency incredulous. (Id.) Claimant never was fired from any of her jobs. (Tr. at 346.) Additionally, Claimant worked in the past running cash registers, cooked burgers, and did food preparation at a fast food restaurant. (Tr. at 45-46.)

The ALJ also noted that Claimant raised three children, prepared meals, did laundry, cleaned her house, shopped for groceries, attended church, and visited with her in-laws. (Tr. at 28.) Claimant testified that she had problems helping her children with their homework, but otherwise she had no difficulty caring for them. (Tr. at 47-48.) She likewise received no special accommodation for the care of her children from social services. (Tr. at 47.) Claimant testified that she had a driver's license after several attempts at the age of 21, and drove to the grocery store, church, and to visit her in-laws. (Tr. at 36-37, 55-56, 58.) She also testified that her children helped her check her email, that she and her husband jointly paid their bills, and that she writes her bills. (Tr. at 58.)

Though Claimant achieved low scores on the WRAT testing, there is no indication in the record that those deficits, if they are reliable, existed prior to the age of 22, given the foregoing work and personal histories of Claimant.

Accordingly, the Court finds that the ALJ's finding of no significant deficits in adaptive functioning is supported by the substantial evidence of record. Consequently, his decision that

Claimant did not meet Listing 12.05C or 12.05D also is supported by substantial evidence as she did not demonstrate significant adaptive deficits prior to the age of 22.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 15.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 17.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Memorandum Opinion to counsel of record.

.       ENTER: March 31, 2011.

R. Clarke VanDervort
United States Magistrate Judge